RECEIVED
IN ALEXANDRIA, LA

MAR - 9 2009

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA



UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

MICHAEL SAMPSON                    DOCKET NO. 08-CV-0915; SEC. P
DOC# 295609

VERSUS                             JUDGE DEE D. DRELL

CORRECTIONS CORPORATION OF         MAGISTRATE JUDGE JAMES D. KIRK
AMERICA, ET AL.

## REPORT AND RECOMMENDATION

Before the court is a civil rights complaint (42 U.S.C. §1983) filed by Plaintiff Michael Sampson, *pro se* and *in forma pauperis*, on June 24, 2008. Plaintiff was ordered to amend his complaint, and he filed an amended complaint on December 16, 2008. Sampson is an inmate in the custody of the Louisiana Department of Public Safety and Corrections (LDOC) and is housed at Winn Correctional Center (WCC) in Winnfield, Louisiana. In his original complaint, Plaintiff sought only injunctive and declaratory relief on a class-wide basis. In his amended complaint, he also asks for monetary damages under 42 U.S.C. §1983.

Plaintiff alleges numerous violations by the defendants of his own constitutional rights and the constitutional rights of other inmates. This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of the Court.

## PROCEDURAL BACKGROUND

Plaintiff alleges violations of his constitutional rights and

the rights of other inmates, including seven others who contemporaneously filed claims in this Court. The Plaintiff names as defendants: Corrections Corporation of America (CCA), Warden Tim Wilkinson, Deputy Warden Tim Morgan, Deputy Warden Angel A. Martin, Chief of Security Virgil Lucas, Governor Bobby Jindal, and LDOC Secretary James LeBlanc.

Plaintiff claims that overcrowding at WCC and certain policies and procedures of LDOC and CCA have led to the violation of his constitutional rights, as well as the rights of other inmates at WCC. Petitioner alleged numerous general Eighth and Fourteenth Amendment violations, but provided very few facts in support of his conclusory allegations. The few specifics he did provide in the original complaint involved unnamed inmates, not Plaintiff.

Plaintiff was ordered to amend his complaint to provide specific factual allegations to support his claim that **his** constitutional rights were being violated - and would continue to be violated without prospective injunctive relief. Plaintiff failed to comply with the court's order. Specifically, Plaintiff was ordered to state the name of each person who allegedly violated *his* constitutional rights; a description of what *each defendant did* to violate *Plaintiff's* rights; the place and date that each event/violation occurred; and a description of the alleged injury that he sustained as a result of the alleged violation. He was also ordered to provide any facts to support his conclusory

2

allegations that he had been denied due process, medical care, protection from harm by other inmates, protection from abuse by guards, protection from arbitrary discipline, protection from unconstitutional conditions of confinement, and denied access to the courts.

Rather than answer the Court's questions directly, Plaintiff filed 37 pages of argument and 156 pages of exhibits. The Court has reviewed all exhibits, summarized them in chronological order below, and finds that Plaintiff has not presented sufficient factual allegations to garner monetary, injunctive, or declaratory relief.

### ALLEGATIONS FROM ORIGINAL COMPLAINT

In his complaint, Plaintiff alleged the following constitutional violations:

1. excessive, malicious and sadistic use of force by staff;

2. use of chemicals such as tear gas and pepper spray to punish or threaten inmates, sometimes administered to an entire dormitory, and then a lack of medical treatment afterward;

3. four and five point hand restraints used for mentally ill inmates, without cause and without proper monitoring;

4. inmates placed in isolation for arbitrary reasons and not properly monitored in isolation;

5. inmates exposed to unreasonable risks of harm by other inmates due to inadequate staffing and unsupervised or improperly trained guards;[1]

---

[1]Plaintiff alleges that inmates will self-mutilate and injure themselves in hopes of being placed in protective custody to avoid harm from other inmates.

6.  ignoring a known practice of "kicking out" where larger inmates force young or fragile inmates to give up food items or personal belongings under threats of violence;

7.  placing "hits" on certain inmates and "hiring" other inmates to beat up or intimidate them;

8.  abusive and arbitrary disciplinary practices that are painful and demeaning;

9.  failing to conduct disciplinary hearings;

10. failing to investigate complaints of abuse by guards and thwarting inmates' efforts at contacting PZT (project zero tolerance);

11. failing to provide adequate mental health care;

12. failing to provide adequate physical health care, including vision, hearing, dental, and substance abuse treatment;

13. lack of programs, recreational items, or activities to occupy inmates;

14. lack of nutritional meals;

15. failing to provide inmates privacy in bathrooms;

16. failing to provide sufficient clothing, shoes, and linens;

17. inadequate access to the courts; and

18. retaliation against those inmates who try to access the courts.

## THE ORDER TO AMEND

Plaintiff was ordered to state specifics as to who did the enumerated acts as well as when, where, and to whom. After receiving the order to amend, Plaintiff asked for an extension of time to comply with the order because he was not being allowed extra time in the law library. [Doc. #9] The undersigned granted additional time, but informed Plaintiff that he did not need the

4

law library to provide the factual information requested in the Memorandum Order. [Doc. #10]

In the amended complaint, Plaintiff states that it was "difficult to formulate a response to Magistrate Judge Kirk's order to amend, because plaintiff has not had the opportunity of discovery." [Doc. #11, p.18]  Plaintiff clearly did not need "the opportunity of discovery," as he managed to collect 156 pages of exhibits dating back to 2004, which Sampson filed along with his amended complaint.  Contrary to Plaintiff's assertion, no legal research *or* discovery was necessary for Plaintiff to tell his version of who did what.  The Court only asked for the basic facts supporting Plaintiff's claims, not any legal arguments or conclusions.

## EXHIBITS ATTACHED TO AMENDED COMPLAINT

### A.    Years 2002-2004

The exhibits contain a first step response form dated August 13, 2004 responding to a grievance filed by Sampson on June 29, 2004.  Prior to being sent to Winn Correctional, Sampson attempted escape at another prison and jumped over a fence, injuring his thumb.  Sampson voiced complaints of thumb, forearm and wrist pain, and he received a duty status related to those complaints.  On February 21, 2002, Sampson saw another doctor who referred him to the orthopaedic clinic.  On March 22, 2002, Sampson was provided another duty status.  An indoor duty status was given for September

23, 2002 through December 23, 2002. On September 23, 2003, Sampson's duty status was changed to regular duty with no restrictions. On December 8, 2003, a left knee mass was discovered and removed at LSU Medical Center. It is noted that Sampson was non-compliant with the medication for pain relief after surgery. Sampson's inmate request for yet another "duty status" was denied at the first and second step. [Doc. #11-3, p.133-134]

**B. Year 2005**

Next in the exhibits is a medical form dated February 2, 2005 where Sampson complained of stomach, knee, and head pain. He was administered cold medicine and referred to the medical doctor for evaluation. [Doc. #11-3, p.32] Other medical records indicate that Sampson was given sinus medication on March 4, 2005 and referred to the doctor for joint pain. [Doc. #11-3, p.33]

Plaintiff was seen on April 19, 2005 and referred to the doctor for complaints of knee pain with a history of surgery on his knee. [Doc. #11-3, p.34] Sampson submitted a complaint because the doctor appointment was cancelled and rescheduled. The response indicates that the doctor had cancelled the clinic that day, but that Sampson's appointment had been rescheduled. [Doc.#11-3, p.73]

**C. Year 2006**

Plaintiff submitted a grievance on January 6, 2006 stating that he had been denied access to requested books and cases by "inmate counsel" who made rounds in the Cypress unit, where

Plaintiff was housed. Inmate counsel advised Sampson that he would have to contact Ms. Walker to obtain the requested material. The first step response states that, on the day in question, Sampson received the Self Help Litigation Manual. There were no records that Sampson sent a request to Ms. Walker for any other material. [Doc. #11-3, p. 132]

Sampson also complained that "the law library is closed most of the time because of the lack of security." However, the library log book showed that Sampson visited the library a total of *nine times* between December 15 and December 30, 2005. Records also show that the library began to experience Lexis problems in January 2006, and Chaplain Olliff pulled cases during the time that it took to replace the computer software. Sampson's grievance was denied. [Doc. #11-3, p.132]

On April 4, 2006, Sampson submitted a complaint that he had been sprayed with pepper spray. According to the response, Sampson was "racking" the bars of his cell on April 4, 2006. Officer Braxton ordered Sampson to stop. After Braxton exited the tier, Sampson began racking the bars again, and he was again ordered to stop. Sampson then started to "rack" the bars again, and Braxton administered one burst of inflammatory agent to gain compliance. Sampson was written-up and had a hearing on April 6, 2006. He appealed and received a denial on May 12, 2006. [Doc. #11-3, p.95-96] At the second step, it was found that the first response was

clear and concise, and Sampson's appeal was denied on September 27, 2006. [Doc. #11-3, p.97]

Also on April 4, 2006, Sampson submitted an ARP stating that he had been assaulted by Lt. Vernon and denied medical care by nurse Boyd. [Doc. #11-3, p.110-112] Sampson states that he was being escorted to the Cypress unit for violating disciplinary rules (apparently for disobeying orders from Braxtno). Sampson was trying to explain the incident to Lt. Vernon, but Lt. Vernon "didn't want to hear what [Sampson] was saying." Sampson "kept on talking" and refused to stop "explaining [himself]." [Doc. #11-3, p.110] Eventually, Lt. Vernon pushed him against the wall outside of the Cypress unit, hurting Sampson's lower back. Sampson then "started to argue with Lt. Vernon as to his assault." Lt. Vernon walked Sampson into Cypress unit and, according to Sampson, he "was still arguing with Lt. Vernon." Vernon handed Sampson off to other officers, and Sampson said to Lt. Vernon, "come re-handle me without the handcuffs on." [Doc. #11-3, p.110]

Sampson was stripped of his blue uniform and dressed in the Cypress orange. Sampson asked the officer that uncuffed him to send Lt. Vernon back over to talk with him. Instead, a different officer went to see Plaintiff, and Plaintiff stated that he needed to make a medical emergency because he had been assaulted by Lt. Vernon. The officer told Plaintiff that he would call the infirmary for Sampson, but that this was not a medical emergency.

Nonetheless, a nurse came in to see Sampson about an hour later. The nurse said the only thing she could do was give him Motrin. Sampson wrote that he was going to "seek charges" against Vernon as well as monetary damages for the "unprofessional conduct" of the other officers and nurse. [Doc. #11-3, p. 110-113] The first step response to Plaintiff's grievance indicates that the nurse found no bruises or abnormalities, and that Plaintiff saw another nurse and received Motrin on April 6, 2006. [Doc. #11-3, p.114] The ARP was denied at the first and second step. [Doc. #11-3, p.115]

Sampson also filed an inmate request form on April 6, 2006 seeking another three month prescription for Motrin. He was seen in the infirmary and was provided the prescription on April 11, 2006. [Doc. #11-3, p.69]

While locked up in the Cypress unit, Plaintiff submitted an inmate complaint dated April 11, 2006, stating that "the food that is being served in the afternoon and evening is being served cold." He also complained that he and the other inmates on his tier each received only one cookie, when Plaintiff believed they should each receive two cookies. The warden responded, "I will have your complaint checked." [Doc. #11-3, p.71]

Plaintiff submitted another form on May 11, 2006 complaining that he had not received the second step on a particular ARP; he wrote that he would "seek federal charges" against Ms. Heyse, the screening officer. [Doc. #11-3, p.74] Sampson filed an ARP on May

16, 2006 asking for copies of a previously filed ARP; he was told to see his case manager for the copies. [Doc. #11-3, p.75] He sent another request for copies of a different ARP on May 16, 2006, and he received them on May 23, 2006. [Doc. #11-3, p.76]

Plaintiff provided the court with a copy of a letter written to the FBI on May 12, 2006, informing them that he had been assaulted by Lt. Vernon the month before. He sent another letter to the FBI on June 1, 2006. [Doc. #11-3, p.26] The FBI responded on January 12, 2007, telling Sampson that he would have to *supply additional facts* in order for them to evaluate his allegations. [Doc. #11-3, p.27] Plaintiff corresponded a few more times with the FBI [Doc. #11-3, p.28, 30, 31] and ultimately received a letter from the agency stating that it had reviewed all of the letters Sampson sent, and decided not to conduct an investigation. The FBI evaluated Sampson's allegations regarding the "assault" by Lt. Vernon and *was unable to identify any violation of federal law.* [Doc. #11-3, p.29]

Sampson made a sick call on May 18, 2006 for a knot in his stomach, and an emergency call on May 20, 2006 for that same problem. He was referred to the doctor, who reviewed and signed the emergency call sheet on May 27, 2006. [Doc. #11-3, p.35-36]

On May 23, 2006, Sampson sent another request to the screening officer asking for a copy of one of his ARP forms. He stated that "if you Ms. Heyse fail to respond to this request within five (5)

days I'll inform my attorney and seek suit against you...." [Doc. #11-3, p.126]

Sampson filed inmate requests on May 24, 2006 and May 28, 2006 complaining that he was being denied medical treatment. He claims that, on May 25, 2006, he declared a medical emergency for a "life threatening illness" because he was having chest pains and difficulty breathing. He states that his emergency was denied because the breathing machine was locked up in an office. He claims that the nurse violated the emergency medicine policy because he had a "life threatening illness." Sampson states that he could have died from a "lung collapse" or a heart attack because the nurse refused to evaluate him. [Doc. #11-3, p.116-118] A first step response denying Sampson's ARP states that Plaintiff was evaluated by a nurse on May 25, 2006 and was found to have no difficulty breathing. Moreover, it states the Sampson has not ever been diagnosed with asthma, but with chronic sinusitis and rhinitis. It notes that Sampson has an Albuterol inhaler in his possession, which has the same effect as the nebulizer that he wanted to use. [Doc. #11-3, p.101]

On May 30, 2006, Sampson submitted a complaint that he wanted to be evaluated by the doctor, not a nurse. The response states that Plaintiff should submit a sick call form if he wants to see the doctor. [Doc. #11-3, p.148]

Sampson submitted a request to the medical director on June 1,

2006 stating that he really needed to speak with her. [Doc. #11-3, p.149]

Plaintiff was seen on June 7, 2006 for back pain [Doc. #11-3, p.37]. He submitted another sick call request for back pain allegedly caused by Lt. Vernon on June 6, 2006. He received a doctor referral on June 9, 2006. [Doc. #11-3, p.40]

On June 16, 2006, Plaintiff submitted an inmate complaint about the law library. The first step response states that the law library is generally open daily. However, if it is temporarily closed during scheduled hours, "it is because security at this facility and the inmate population comes first." [Doc. #11-3, p.128-130]

On June 21, 2006, Plaintiff complained in writing to Pat Thomas that the nurse had only given him Motrin at pill call when the dentist had "extended [his] other medication." He also complained that the nurses handed out medication without wearing gloves. [Doc. #11-3, p.79]

On June 26, 2006, Sampson was examined by the doctor for a cystic mass. It is noted that Plaintiff was taking Pen-VK, 500 mg, ibuprofen 800 mg, Percogesic, Rhinocort nasal spray, and loratidine 10 mg. It is noted that no hernia treatment was required at that time. [Doc. #11-3, p.47]

On June 26 2006 and June 27, 2006, Plaintiff submitted inmate request forms regarding Nurse Tucker handing out medication without

gloves and accusing the medical director of "malfeasance in office." The responses dated July 3, 2006 and July 5, 2006 indicate that the issue had been addressed with Sampson on July 3, 2006. [Doc. #11-3, p.80, 82]

On July 6, 2006, Plaintiff requested information about a backlogged ARP and asked for copies of the document. He was told to see his case manager for copies. [Doc. #11-3, p.81]

On July 13, 2006, Sampson submitted an "emergency" request claiming that his life was threatened because he and other inmates had received milk that day with an expiration date of July 12, 2006. [Doc. #11-3, p.125]

Sampson filed another inmate request form on July 15, 2006 because he had submitted a sick call on July 10, 2006, and had not been called out. He was told that he would be called when the nurse returned to work. The response indicates that Sampson was seen by the nurse on July 24, 2006, and would be referred to the doctor. The nurse also wrote that Sampson would have a standing appointment every Monday for his various ailments. [Doc. #11-3, p.83]

Sampson was treated by the doctor again on July 25, 2006 for knee and ankle pain [Doc. #11-3, p.38] He was provided antifungal powder per his request. [Doc. #11-3, p.47]

Sampson complained on July 26, 2006 that Nurse Boyd discontinued his Montrin. L. Coleman wrote a reply stating that

13

the issue had been addressed with Plaintiff on July 28, 2006. [Doc. #11-3, p.84]

On August 8, 2006 and August 10, 2006, Plaintiff filed requests asking that he be allowed to review all Winn Correctional Medical Policies. The warden replied that he would need to contact an attorney, Chris Bowman, and request the documents through him. [Doc. #11-3, p.85-86]

On August 10, 2006, the nurse saw Sampson in his cell in Cypress unit. She noted that Sampson was still complaining about not being seen in sick call by the nurse on June 10, 2006 and July 10, 2006. She also noted that Sampson had no new medical complaints. [Doc. #11-3, p.47]

Plaintiff was examined by a nurse on August 11, 2006 for knee and ankle pain. He was examined by the doctor on August 17, 2006, and he reported chronic knee pain since a knee surgery in 2003, now radiating down to the left ankle. He complained of low back pain since the April 2006 altercation with Lt. Vernon, but there was no neurological deficit. The doctor made a note that the umbilical hernia was not obstructed and had not changed since January 2006. [Doc. #11-3, p.49]

Sampson had a follow up appointment with the doctor on September 26, 2006 for back pain, allergies, sinus congestion, and knee pain. He was diagnosed with persistent allergies. There is a notation in the doctor's notes regarding hernia surgery. [Doc.

#11-3, p.50]

Plaintiff's medical chart indicates that he was transported to and from LSU hospital on October 17, 2006 for an appointment regarding his hernia. [Doc. #11-3, p.50]

Sampson made a sick call on October 24, 2006 for stomach pain. [Doc. #11-3, p.43] He was examined on October 27, 2006. He reported pain with palpitation. It was noted that he was taking Motrin for pain, had been to LSU on October 17th, and had a follow up appointment at LSU scheduled for November 6, 2006. [Doc. #11-3, p.44, 50]

On November 4, 2006, Plaintiff filed an inmate request form complaining that the infirmary had scheduled his dental appointment on the same day as his appointment at LSU medical, so he could not see the dentist. The nurse responded that Plaintiff's dental appointment had been rescheduled for him. [Doc. #11-3, p.93]

Also on November 4, 2006, Plaintiff filed an inmate request for thermal underwear, but the warden replied that thermal underwear is only issued to trustees. [Doc. #11-3, p.89]

Plaintiff was transported to and from LSU for another appointment on November 6, 2006. [Doc. #11-3, p.50]

On November 7, 2006, Plaintiff filed an inmate request complaining that Ms. Burke was not giving him medication at pill call. Nurse Coleman put Plaintiff on the call-out list for November 17, 2006. [Doc. #11-3, p.90-91]

Sampson was examined by the doctor on November 14, 2006, after two consultations at LSU.  It was determined that hernia surgery was not necessary at that time. [Doc. #11-3, p.45]  Plaintiff submitted an inmate request form on November 19, 2006 asking why the doctor said he did not need surgery.  The nurse replied that Sampson still had five appointments scheduled at LSU. [Doc. #11-3, p. 92]

Plaintiff was seen on December 6, 2006 for stomach pain and on January 4, 2007 for back pain and a prescription renewal.  [Doc. #11-3, p.45-6, 52]

## D.    Year 2007

On January 17, 2007, Plaintiff complained to the warden about his tooth, and the Warden asked Nurse Coleman about the situation. Coleman responded that Sampson's tooth had been filled on January 17, 2007. [Doc. #11-3, p.94]

On January 20, 2007, Sampson requested a prescription refill, and a new script was given on January 24, 2007. [Doc. #11-3, p.54]

Sampson requested Motrin for left leg pain and low back pain on February 21, 2007.  The response of March 26, 2007 states that Sampson is being followed by the doctor. [Doc. #11-3, p.144]

Winn has provided Plaintiff with a number of ARP input screen forms noting a backlog on Sampsons ARPs.  One referred to Plaintiff's complaint of March 17, 2007 that Officer Jones and Officer Guyotte were sitting in chairs instead of watching over the

inmates. [Doc. 11-3, p.56]

On March 18, 2007, Sampson submitted an inmate request form asking why his duty status had changed to regular duty. The response states that the doctor prescribed treatment according to medical need. [Doc. #11-3, p.143] He submitted another request on March 22, 2007 asking to have his duty status changed. The response advises Sampson to fill out a sick call request to be re-evaluated. [Doc. #11-3, p.145]

On 3/26/07, Sampson submitted a request form asking why his ARPs have been "abandoned." The response states that they have not been abandoned - that they are waiting on a response from the doctor for one ARP, and that there were five more backlogged after that. [Doc. #11-3, p.146]

Sampson submitted another sick call request on March 29, 2007 seeking a change in duty status. He was seen by the doctor on March 30, 2007. [Doc. #11-3, p.45]

Plaintiff made a medical emergency on April 20, 2007 for dental pain, but the infirmary denied his request and said that he would have to wait to see the dentist. In his medical emergency form, Sampson complained that both of the pain medications prescribed by the dentist did not alleviate his pain. Sampson happened to talk to the dentist on April 20, 2007. The dentist told Sampson that he could not treat him that day, but that Sampson was "on the schedule soon." [Doc. #11-3, p.57-59] While the

17

dentist could not see Plaintiff on the day of his "emergency," he wrote an order for Percogesic on April 23, 2007 for Sampson's pain, and Sampson did see the dentist on May 17, 2007. The dentist determined that Sampson's pain was from a previous filling. Plaintiff was prescribed an antibiotic. On May 23, 2007, the filling was removed and replaced. [Doc. #11-3, p.63]

On May 4, 2007, Sampson submitted a request form to the screening officer asking why he did not receive the ARP envelope with the last step for one of his grievances. The response states that the envelope goes back to DOC for their records. [Doc. #11-3, p.147]

Plaintiff wrote a letter to prison officials and CCA on May 8, 2007, alleging that an FBI investigation of WCC was being conducted. Sampson stated in the letter that the "doctor at this facility refuse to give me any pain reliever medication," which is cruel and unusual punishment. He also stated that, because the doctor failed to properly diagnose an illness, the doctor acted with deliberate indifference. [Doc. #11-3, p.60-62]

On May 9, 2007, Sampson submitted an inmate request form asking that he be placed "on call out to make a legal phone call to the F.B.I." The response was to see the Chaplain to make a legal phone call. [Doc. #11-3, p.151]

On July 29, 2007, Sampson requested the number of the ARP that he had filed against the dentist in 2007. Heyse responded to his

inquiry on July 30, 2007. [Doc. #11-3, p.150]

On August 30, 2007, Sampson filed an inmate request form asking why he had to work in the field when he has back problems, knee problems, and a hernia. The response states, "Has duty status." [Doc. #11-3, p.152]

An inmate request form on October 23, 2007 asks about a change in his duty status. The response states that LSU discharged Sampson from the clinic. [Doc. #11-3, p.153]

Plaintiff provided the Court with an inmate request form complaining about unanswered administrative remedy forms. [Doc. #11-3, p.1]

The exhibits also contain a first step response to a complaint on October 29, 2007 that portions were missing from Plaintiff's food tray. [Doc. #11-3, p.2] Assistant King says he was not made aware of Sampson having portions missing from his tray.

Also on October 29, 2007, Sampson complained that he was being lied to about his medical records and that he can take Motrin as needed. The response states, "Motrin prescription is now over." [Doc. #11-3, p.154]

**E.    Year 2008**

The next exhibit is from April 13, 2008. Sampson sent a request form asking which of his ARPs were backlogged. L. Steele said she was sending Sampson what she had. On April 18, 2008, Sampson requested the case number of the last ARP filed by him that

had been answered. He was informed that one was being processed and had two backlogged. [Doc. #11-3, p.137-139]

Plaintiff submitted another ARP complaining that an inmate committed suicide on May 4, 2008. He alleged that, if the tier were being properly monitored, the incident would have happened. [Doc. #11-3, p.3-4]

On May 6, 2008, Sampson submitted an inmate complaint because he gave legal mail to his case manager on April 30, 2008, but it did not go out until May 5, 2008. Sampson complained that it should have gone out on May 1st. The response states that if Sampson puts his mail directly in the mailbox rather than handing it to the case manager, it would go out that day, without delay. [Doc. #11-3, p.135]

In a May 12, 2008 inmate request form, Sampson complains that he was being forced to work in the field despite his aching back, knee, and stomach. The response states that "Chart reviewed D/S regular ō sports - LOC changed from 2 to 3. Dr. orders stand." [Doc. #11-3, p.136]

On 5/31/08 and 6/9/08, Sampson complained that he had submitted administrative grievances, but had not received case numbers for them. L. Steele and M. Heyse responded that they did not have any complaints from Sampson like the ones he described. [Doc. #11-3, p. 140-142]

Plaintiff submitted an ARP on 7/1/08 arguing that there are

too few guards to supervise all inmates' activity. He requested that additional guards be hired. [Doc. #11-3, p.5-7]

An inmate request dated 7/10/08 complains that Plaintiff caught Officer Carpenter asleep on the job. He requested that Carpenter be disciplined for the incident and that guards be placed in the dormitories. [Doc. #11-3, p.8-10]

Plaintiff provided a copy of correspondence written by him to Secretary James LeBlanc on 7/17/08. He complained that guards do not follow the rules, are not properly trained, "horse play" with inmates, and have no control over inmates. He also wrote that inmates "cut" and push in the kitchen line and the guards do not make those inmates go to the back of the line. He stated that the ARP system is inadequate. Finally, he advised that some inmates were being abused and raped; however, he did not state the names of the assailants or the victims and provided no specific instances of abuse. [Doc. #11-3, p.11-13]

The exhibits contain a disciplinary report from 7/25/08, wherein Plaintiff was charged with theft by fraud. He was apparently accused of lying in a letter to headquarters about the number of ARPs filed by him that have never been answered. The form does not indicate what, if any, punishment Plaintiff received for the write-up. [Doc. #11-3, p.14]

Plaintiff provides a copy of his follow up letter sent to LeBlanc on 7/30/08, advising him that Plaintiff had been written up

21

for lying. In the letter, Plaintiff claims that the warden threatened him with bodily harm. [Doc. #11-3, p.18]

Plaintiff provided a copy of an ARP request from 10/8/08 complaining that inmates are chosen to work in the kitchen without proper medical evaluation to ensure that they have no contagious illnesses. He was seeking an investigation by the Department of Health and Hospitals (DHH) and the Department of Public Health and Safety (DPHS) as his remedy. [Doc. #19-22] He also wrote to the DHH because he was cleared to work in the kitchen without any medical evaluation. [Doc. #11-3, p.23-24]

## LAW, ANALYSIS
## & APPLICATION OF ALLEGATIONS TO FACTS PROVIDED

Sampson was ordered to amend his complaint to provide details regarding the approximately eighteen claims set forth in his complaint. First, Plaintiff was ordered to inform the court which of his constitutional rights were violated as "... the plaintiff generally **must assert his own legal rights and interests**, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S. 490, 499 (1975) (emphasis added).

Additionally, "[t]hat a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which

22

they purport to represent.' " <u>Simon v. Eastern Ky. Welfare Rights</u> <u>Organization</u>, 426 U.S. 26, 40, n. 20 (1976), quoting <u>Warth v.</u> <u>Seldin</u>, 422 U.S. 490, 502 (1975).

Plaintiff has to show that he has standing to invoke the power of the federal courts. Article III of the Constitution confines the federal courts to deciding actual cases and controversies. <u>Allen v. Wright</u>, 468 U.S. 737 (1984). "Standing defies precise definition, but at the least insists that the complained of injury be real and immediate rather than conjectural, that the injury be traceable to the defendant's allegedly unlawful conduct, and that relief from the injury must be likely to follow from a favorable ruling." <u>Society of Separationists, Inc. v. Herman</u>, 959 F.2d 1283 (5th Cir. 1992), (citing <u>Allen v. Wright</u>, <i>supra</i>.) To obtain equitable relief for past wrongs, a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future. <u>See</u> <u>id.</u>

In <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95 (1983), the Supreme Court made clear that plaintiffs may lack standing to seek prospective relief even if they have standing to sue for damages. The Court observed that "'past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.'" <u>Lyons</u> (quoting <u>O'Shea v. Littleton</u>, 414 U.S. 488, 495-96 (1974)). To obtain equitable relief for past wrongs, a plaintiff

must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future.

To show a violation of the Eighth Amendment, the inmate must establish (1) a deprivation of a basic human need, Helling v. McKinney, 509 U.S. 25, 31-32 (1993), and (2) deliberate indifference, Wilson v. Seiter, 501 U.S. 294, 303 (1991).

In the instant case, Plaintiff has presented only conclusory allegations. Moreover, the complained of "threat" is not "real and immediate." Plaintiff has not shown unconstitutional conduct by the defendants, nor can he show that relief from the claimed injury would be likely to follow from a favorable ruling. He has not established any injury in fact, ie., an invasion of a legally protected interest that is concrete and particularized. See Allen v. Wright, 468 U.S. at 756; Warth v. Seldin, *supra*. The factual allegations and exhibits submitted by Plaintiff will be applied to his legal claims as follows.

1. Excessive, malicious and sadistic use of force by staff

Plaintiff argued that the staff of WCC uses excessive force maliciously and sadistically. Plaintiff was ordered to amend to provide facts to support this conclusory allegation. The only force referenced in his exhibits - during more than seven (7) years of being housed at Winn Correctional - are: (1) a single instance where he was sprayed with one burst of inflammatory agent on 4/4/06 and (2) a single instance of being pushed against a wall on that

24

same day, 4/4/06.  The facts leading to both of those situations on 4/4/06 were discussed above.

Based on his exhibits, it appears that Sampson intentionally provoked the guards on 4/4/06.  First, Sampson continually "racked" the cell bars, even after being ordered to stop multiple times. Finally, one burst of inflammatory agent was sprayed to gain compliance.  [Doc. #11-3, p.95.]  Then, while being escorted to the Cypress unit after the incident, Sampson argued incessantly with Lt. Vernon about what happened.  In his own words, Sampson was trying to "explain" the incident to Lt. Vernon.  He states, "Lt. Vernon didn't want to hear what I was saying, but I kept on talking in a normal tone, because, I wouldn't stop explaining myself." Sampson continued to try and argue his case to Lt. Vernon.  [Doc. #11-3, p.110]  Eventually, Lt. Vernon pushed Plaintiff against the wall outside of the Cypress unit, and Sampson then "started to argue with Lt. Vernon as to his assault."  [Doc. #11-3, p.110-111] He writes, "He then walk me into cypress unit.  I was still arguing with Lt. Vernon."  [Doc. #11-3, p.110]

To establish a claim of excessive force, Plaintiff must establish that prison officials acted *maliciously* and *sadistically*, and *not in a good-faith effort to maintain or restore discipline*. See Baldwin v. Stalder, 137 F.3d 836, 838 (5th Cir.1998) (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)).  Not every malevolent touch by a prison guard gives rise to a federal cause of action.

See <u>Hudson v. McMillian</u>, 503 U.S. 1, 10 (1992). The Eighth Amendment's prohibition of "cruel and unusual" punishment necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort "'repugnant to the conscience of mankind.'" <u>Whitley v. Albers</u>, 475 U.S. 312, 327 (1992)(citations omitted).

Plaintiff stated no facts to show that any officer acted maliciously or sadistically *for the purpose of causing harm*. Based on documents submitted by Plaintiff in response to the amend order, it appears that Lt. Vernon and Assistant Braxton used only the amount of force necessary to restore the discipline breached by Sampson's belligerence and non-compliance. Moreover, the amount of force used was not *repugnant to the conscience of mankind*, and seems to have been administered in good faith.

Additionally, despite being incarcerated at Winn Correctional for over seven years, Sampson was only able to point to these two instances - on one single day - to support his claim that WCC staff regularly uses excessive force in a malicious or sadistic manner. Not only does Plaintiff fail to show that his constitutional rights were violated on this one particular day, but he also fails to provide any facts indicating a pattern of abuse, a real and immediate present threat, or a threat of repeated injury in the future. <u>Society of Separationists, Inc. v. Herman</u>, 959 F.2d 1283 (5th Cir. 1992). As to the alleged injury suffered on the date of

26

the altercation with Lt. Vernon in April 2006, it was not so great as to cause Plaintiff to file a civil action for damages. Regardless, Plaintiff's claim regarding excessive force is without merit, lacks any factual support, and should be dismissed.

## 2. Use of chemicals to punish or threaten

Sampson's second complaint is that WCC staff uses chemicals to punish or threaten inmates. In his complaint, Plaintiff alleged that these chemicals were sometimes administered to an entire dormitory, without any medical treatment provided afterward. Sampson was ordered to provide facts to support his conclusory allegation. He failed to do so. Sampson cited only one instance in more than seven years at WCC where *a single burst* of inflammatory agent was sprayed to gain compliance following his disobedience and continual "racking" of the bars. Moreover, as to that incident, Sampson was written-up, had a hearing on 4/6/06, and was convicted. He appealed and received a denial at the first and second steps. [Doc. #11-3, p.95-97] There is nothing to indicate that the single burst of agent in this incident was sprayed maliciously or sadistically for the purpose of causing harm.

As for his claim of being denied medical care afterward, the documents submitted by Sampson show that he was visited by a nurse in his Cypress cell on the day of the incident.

Sampson could not point to any other instance where he was sprayed with inflammatory agent or any instance where he had

27

received more than one burst of spray. Plaintiff also failed to provide any facts regarding entire dormitories being administered with inflammatory agent or other chemicals. Again, Plaintiff fails to provide any facts indicating a pattern of abuse through the use of chemical agents, nor does he show a real and immediate present threat, or a threat of repeated injury in the future. <u>Society of Separationists, Inc. v. Herman</u>, 959 F.2d 1283 (5th Cir. 1992). There is no evidence of a substantial threat that Plaintiff would suffer irreparable injury if an injunction is not granted. Additionally, Plaintiff cannot show a substantial likelihood that he would prevail on the merits. <u>See</u> <u>Planned Parenthood of Houston & Southeast Texas v. Sanchez</u>, 403 F.3d 324, 329 (5th Cir. 2005). Plaintiff's claim regarding the use of chemical agents to punish or threaten inmates is without merit, lacks any factual support, and should be dismissed.

   3.   <u>Hand restraints used for mentally ill inmates</u>

   Sampson complains that four and five point restraints are used on mentally ill inmates without cause and without proper monitoring. Sampson was afforded the opportunity to amend to provide facts to support this claim, and he failed to do so. Sampson does not allege that he is a mentally ill inmate or that he has ever been subjected to the use of four and five point restraints without cause or proper monitoring. Even if Plaintiff could "rest his claim to relief on the legal rights or interests of

third parties," <u>Warth v. Seldin</u>, 422 U.S. 490, 499 (1975), Sampson provided no facts supporting or even relating to this allegation. It should be dismissed.

### 4. Inmates in isolation

Plaintiff's next complaint is that inmates are placed in isolation for arbitrary reasons and are not properly monitored. Again, Plaintiff submitted no facts regarding placement in isolation or improper monitoring. Sampson has been confined in the Cypress unit for disciplinary incidents, but he does not claim, and the documents submitted do not indicate, that he was isolated or unmonitored. In fact, upon Sampson's request a nurse went to see him in his cell and a guard went to speak with him when he asked that they send Lt. Vernon back to talk to him. [Doc. #11-3, p. 110-113]

### 5. Inmates exposed to unreasonable risks of harm by other inmates

Sampson next complains that inmates are exposed to unreasonable risks of harm by other inmates due to inadequate staffing and unsupervised or improperly trained guards. He alleges that inmates will self-mutilate and injure themselves in hopes of being placed in protective custody to avoid harm from other inmates. Sampson was ordered to provide facts to support these allegations. The only document or fact submitted remotely related to Sampson's allegation is an ARP complaining that an inmate committed suicide on May 4, 2008. Sampson alleged that, if the

tier were being properly monitored, the incident would have happened. [Doc. #11-3, p.3-4] This allegation is speculative and conclusory.

Sampson does not allege that he was ever attacked or harmed by any other inmate. Nor does he claim that he ever had to injure himself in order to secure protective custody. His claim that inmates are exposed to unreasonable risks due to inadequate staffing, improperly supervised and trained guards is conclusory.

### 6. Ignoring a known practice of "kicking out"

Next, Sampson claims that the WCC staff ignores a practice called "kicking out," where larger inmates force younger or fragile inmates to give up food items or personal belongings under threats of violence. Sampson does not allege that he has ever been subjected to this "kicking out" practice, nor does he provide any facts to support the claim that this practice takes place or how often. Sampson does not identify, or even claim to know, one single inmate who has been subjected to the practice or who has committed the practice. Even if Sampson could identify inmates who had been subjected to this practice, he cannot rest his claim to relief on the legal rights or interests of third parties. Warth v. Seldin, 422 U.S. 490, 499 (1975).

### 7. Guards hire inmates to beat up other inmates

Sampson's next allegation is that guards place "hits" on certain inmates and then "hire" other inmates to beat up or

intimidate them. Sampson, again, provides absolutely no facts in support of this claim. He does not allege that any guard ever put a "hit" out on him, nor does he claim that he was ever "hired" or solicited by a guard to hurt or intimidate another inmate. Despite being provided the opportunity to do so, he provides no allegations of when this actually happened or to whom, despite being ordered to amend his compliant and provide such information. His claim is entirely conclusory and should be dismissed.

### 8. Abusive and arbitrary disciplinary practices

Next, Plaintiff claims that the defendants employ abusive and arbitrary disciplinary practices that are painful and demeaning. Based on the exhibits provided, it is evident that Sampson has been written up and convicted of at least one disciplinary violation, and he has been housed in the Cypress cell block apart from the general population on more than one occasion. However, Sampson has not cited a single arbitrary or abusive disciplinary practice.

### 9. Failing to conduct disciplinary hearings

Sampson makes the generalized claim that the staff at WCC fails to conduct disciplinary hearings. Plaintiff provides no facts to substantiate his allegation. He provides documents indicating that he received a disciplinary write-up and was provided a hearing on April 6, 2006. Plaintiff was convicted after the hearing and followed the appeal process, but his appeal was denied. [Doc. #11-3, p.95-96] He was afforded a hearing for the

one disciplinary charge that he references. Sampson provides no other factual allegations of being himself or anyone else being denied disciplinary hearings. His claim is frivolous.

     10. Failing to investigate complaints of abuse by guards

     Plaintiff complains that Defendants fail to investigate complaints of abuse by guards and thwarting inmates' efforts at contacting PZT (project zero tolerance). Sampson provides no factual allegations regarding attempts at contacting project zero tolerance. However, he did provide the Court with copies of numerous letters to Secretary James LeBlanc, Warden Wilkinson, Corrections Corporation of America, the Louisiana Department of Corrections, the Louisiana Department of Health and Hospitals, and the Federal Bureau of Investigation[2]. He has also provided copies of letters that he received from the Department of Justice[3] and the Department of Corrections.[4] Clearly, Sampson's efforts to contact these departments, agencies, and individuals were not thwarted.

     Additionally, Sampson's communication with the defendants was not thwarted, as he provides copies of countless requests and complaints that he made. The complaints were evaluated and investigated by various officials, and responses were provided to Sampson. The complaints range from access to legal materials to

---

[2] Doc. #11-3, p.11-13, 15-17, 19-22, 23-24, 25-26, 28, 30-31

[3] Doc. #11-3, p.26, 29

[4] Doc. #11-3, p.65, 97, 102, 113, 115, 124, 129-130, 134

complaints about the temperature of his food.[5]  Clearly, Sampson's claims were looked into and his efforts at contacting officials were not thwarted.

### 11.  Failing to provide adequate mental health care

Sampson complains that the defendants fail to provide adequate mental health care.  He does not allege that he was ever denied mental health care or ever in need of such care.  He provides no factual allegations whatsoever to support this claim in his complaint, amended complaint, or 156 pages of exhibits.

### 12.  Failing to provide adequate physical health care

Sampson complains that the defendants continue to provide inadequate physical health care, including vision, hearing, dental, and substance abuse treatment.  First, Plaintiff has not ever alleged that he was in need of vision or hearing examinations or substance abuse treatment, nor has he claimed that such care was ever denied - with or without deliberate indifference.  Regardless, prisoners do not have a constitutional right to participate in drug treatment programs.  See Moody v. Doggett, 429 U.S. 78, 88 n. 9 (1976).

As for dental care, Plaintiff made a medical emergency on April 20, 2007 for dental pain, but the infirmary denied his request and said that he would have to wait to see the dentist.  In

---

[5] Doc. #11-3, p.2, 27, 29, 63-65, 67-102, 114-115, 123-124, 128-155

his medical emergency form, Sampson complained that neither pain medication prescribed had alleviated his pain. Sampson happened to talk to the dentist that same day, April 20, 2007. The dentist told Sampson that he could not treat him that day, but that Sampson was "on the schedule soon." [Doc. #11-3, p.57-59]

While the dentist could not see Plaintiff on the day of his "emergency," he wrote an order for Percogesic on April 23, 2007, to relieve pain, and Sampson did see the dentist on May 17, 2007. The dentist determined that Sampson's pain was from a previous filling. Plaintiff was prescribed an antibiotic. On May 23, 2007, the filling was removed and replaced. [Doc. #11-3, p.63]

Based on documents submitted by Sampson, it is evident that he was not denied dental care. He had to wait a couple of weeks for a dentist appointment, but that is hardly unusual in the "free world." Sampson references a variety of pain medications prescribed by the dentist, so clearly the dentist did attempt to relieve some of Sampson's pain until he could be examined and treated. [Doc. #11-3, p.57-59, 79] The doctor replaced a filling and presumably cured the pain, as Sampson has no further complaints regarding dental care. Sampson's complaint is frivolous.

As for medical treatment, Sampson's exhibits are replete with medical documents, summarized above, detailing countless examinations by nurses and doctors at Winn Correctional and the LSU Medical Center. Sampson received knee surgery and hernia surgery

during his incarceration, as well as a variety of medications for various ailments, including Pen-VK (penicillin), ibuprofen, Percogesic, Rhinocort nasal spray, loratidine [Doc. #11-3, p.32, 47], and anti-fungal powder on request [Doc. #11-3, p.47]. To the extent that Plaintiff disagrees with the medical treatment that he has received, he does not state a claim under the Eighth Amendment. See Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997)(*citing* Young v. Gray, 560 F.2d 201, 201 (5th Cir. 1977)); Spears v. McCotter, 766 F.2d 179, 181 (5th Cir. 1985).

13.  Lack of programs

Plaintiff's next complaint is that WCC lacks sufficient programs, recreational items, or activities to occupy inmates. Prisoners do not have a constitutional right to "social services." Smith v. Boyd, 945 F.2d 1041, 1043 (8th Cir. 1991). Nor do inmates have a protected liberty interest in specific educational programs, recreation opportunities, or in avoidance of being transferred to facilities where the programs are less comprehensive. The United States Constitution does not mandate educational, rehabilitative, or vocational programs. See Lato v. Attorney General of U.S., 773 F.Supp. 973, 978 (W.D.Tex. 1991)(*citing* Beck v. Lynaugh, 842 F.2d 759, 762 (5th Cir. 1988), Newman v. State of Alabama, 559 F.2d 283, 292 (5th Cir. 1977), *rev'd in part on other grounds sub nom.,* Alabama v. Pugh, 438 U.S. 781 (1978)). Plaintiff's claims to the contrary are frivolous.

14.  Lack of nutritional meals

Next, Sampson argues that WCC fails to provide inmates with nutritional meals. Sampson has complained to WCC staff about the temperature of the meals and the number of cookies served in the Cypress housing unit. [Doc. #11-3, p.71] He has submitted an "emergency" request to WCC claiming that his life was threatened because he and other inmates were served milk on July 13, 2006 that had an expiration date of July 12, 2006. [Doc. #11-3, p.125] Prison officials do not violate the Eighth Amendment with regard to nutrition if the inmates receive "reasonably adequate" food. Eason v. Thaler, 73 F.3d 1322, 1327 (5th Cir. 1996)(citing George v. King, 837 F.2d 705, 707 (5th Cir. 1988)). There are no factual allegations that even come close to showing that Sampson is receiving less than "reasonably adequate" food. What Sampson has presented are trivial complaints. Sampson's claim that the meals are non-nutritional is conclusory and unsupported by fact.

15.  Failing to provide inmates with privacy in bathrooms

Sampson claims that inmates are not given privacy in the bathrooms. The law is clear: "at best, convicted criminals retain only 'very minimal' privacy rights during their incarceration." See Oliver v. Scott, 276 F.3d 736, 744 (5th Cir. 2002). Indeed, the United States Supreme Court has noted that loss of privacy is an inherent incident of confinement. See Hudson v. Palmer, 468

U.S. 517, 528 (1984).[6]  "Because the need to watch prisoners closely is a legitimate institutional concern, a prisoner is entitled to little if any privacy, even when using the bathroom or taking a shower." Sanders v. Kingston, 53 Fed. App'x 781, 784 (7th Cir. 2002).  Sampson's claim is frivolous.

16.  Failing to provide sufficient clothing, shoes, linens

Plaintiff's next claim is that Defendants have failed to provide him with sufficient clothing, shoes, and linens.  The only clothing reference in Sampson's documents is a request he made to the Warden for thermal underwear.  The warden replied that thermal underwear is only issued to trustees. [Doc. #11-3, p.89]

While at some point, the failure to provide certain articles of clothing and linens over an extended period of time could rise to the level of a constitutional violation, Sampson has not shown that this point was reached, even assuming the truth of his factual allegations.  See Newman v. Alabama, 559 F.2d 283, 291 (5th Cir. 1977) rev'd in part on other grounds sub nom Alabama v. Pugh, 438 U.S. 781 (1978)(the Constitution does not require that prisoners, as individuals or as a group, be provided with any and every

_____

[6]The Supreme Court observed that curtailment of privacy rights in prisons is required due to the very traits of the population they house:

"Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent, conduct. Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others...." Id. at 526-527.

amenity which some person may think is needed to avoid mental, physical, and emotional deterioration). Sampson provides no facts to support his conclusory allegation that the clothing provided to him is insufficient.

### 17. Inadequate access to the courts

Plaintiff alleges a "persistent pattern of Defendants and CCA and the employees of CCA interfering with his attempts to pursue his legal actions. [Doc. #11-1, p.12] Sampson complains that his "legal work is comprised of one day a week" in the law library. [Doc. #11-1, p.12]

First, the right of access to the courts assures that no prisoner will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights. Lewis v. Casey, 518 U.S. 343 (1996); Norton v. Dimazana, 122 F.3d 286, 289 (5th Cir. 1997). The Supreme Court has not extended the right to access the courts to encompass any more than the ability of an inmate to prepare and transmit a necessary legal document to a court. Brewer v. Wilkinson, 3 F.3d 816, 821 (5th Cir. 1993), *cert. denied*, 510 U.S. 1123 (1994). In Lewis v. Casey, the Court found that the state is not required to "enable the prisoner to discover grievances, and to litigate effectively once in court." Lewis, 518 U.S. at 354.[7]

---

[7]The Court also stated, "To demand the conferral of such sophisticated legal capabilities upon a mostly uneducated and indeed largely illiterate prison population is effectively to

Sampson complained to the prison officials in January 2006 that "the law library is closed most of the time because of the lack of security." However, the prison officials noted that the library log book showed that Sampson had visited the library a total of *nine times in fifteen days* prior to filing his administrative complaint. Records also show that the library began to experience Lexis problems in January 2006, and Chaplain Olliff pulled cases during the time that it took to replace the computer software. [Doc. #11-3, p.132]

Sampson submitted a grievance on January 6, 2006, that he had been denied access to requested books and cases by "inmate counsel" who made rounds in the Cypress unit, where Sampson was housed. Inmate counsel advised Sampson that he would have to contact Ms. Walker to obtain the specific material that he was requesting. On that day, January 6, 2006, Sampson actually received a Self Help Litigation Manual. There were no records that Sampson sent a request to Ms. Walker for any other legal material. [Doc. #11-3, p. 132]

Plaintiff complained about the law library again on June 16, 2006. The first step response to Sampson's grievance states that the law library is generally open daily. However, if the libary is temporarily closed during scheduled hours, "it is because security

demand permanent provision of counsel, which we do not believe the Constitution requires." Id.

at this facility and the inmate population comes first." [Doc. #11-3, p.128-130]

In the instant case, Sampson complained about not having extra time in the law library. The undersigned specifically informed Plaintiff that he did not need a law library to provide the factual information requested in this Court's Memorandum Order. [Doc. #10]

Sampson has not presented facts indicating that he was ever denied the opportunity to present allegations concerning violations of fundamental constitutional rights to the judiciary. He has had sufficient access to file - *just in the instant matter* - an approximately 67 page complaint [Doc. #1], a Motion for Leave to Proceed in forma pauperis [Doc. #2], a Motion to Appoint Counsel [Doc. #4], a Motion to Consolidate Cases [Doc. #5], a Motion for Extension of Time [Doc. #9], a 37 page amended complaint/memorandum [Doc. #11-1, 11-2], 156 pages of exhibits [Doc. #11-2], and a "Response in Opposition" to a court order [Doc. #12]. He has managed to file other suits in this district court, as well. Sampson's claim is frivolous.

18. <u>Retaliation against inmates who try to access the courts</u>.

Sampson makes a general claim that the guards retaliate against those inmates who try to access the courts. He submits no facts to support this conclusory allegation, and his claim is frivolous.

## SUMMARY

In summary, the Fifth Circuit has held that indicia of confinement constituting cruel and unusual punishment include wanton and unnecessary infliction of pain, conditions grossly disproportionate to the severity of the crime warranting imprisonment, and the deprivation of the minimal civilized measures of life's necessities. See Wilson v. Lynaugh, 878 F.2d 846, 848 (5th Cir.), cert. denied 493 U.S. 969 (1989). The Supreme Court has held that, to the extent that prison conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society. Rhodes v. Chapman, 452 U.S. 337, 346-7 (1981). In compliance with the Supreme Court's opinion, the Fifth Circuit has stated that the Eighth Amendment does not afford protection against mere discomfort or inconvenience. See Wilson, 878 F.2d at 849. What Sampson has presented here are precisely allegations of discomfort and inconvenience. Plaintiff has not presented any constitutional violations.

Moreover, to obtain a preliminary injunction, Plaintiff would have to show (1) a substantial likelihood that he would prevail on the merits, (2) a substantial threat that he would suffer irreparable injury if the injunction is not granted, (3) that his threatened injury outweighed the threatened harm to the party whom he sought to enjoin, and (4) that granting the preliminary

injunction would not disserve the public interest.  See Planned Parenthood of Houston & Southeast Texas v. Sanchez, 403 F.3d 324, 329 (5th Cir. 2005).  For a *permanent* injunction to issue, the plaintiff must prevail on the merits of his claim and establish that equitable relief was appropriate in all other respects.  See Dresser-Rand Co. v. Virtual Automation Inc., 361 F.3d 831, 847 (5th Cir. 2004)(*citing* Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 546 n. 12 (1987)(recognizing that the standard for a permanent injunction is essentially the same as for a preliminary injunction with the exception that the plaintiff must show actual success on the merits rather than a mere likelihood of success)).

Injunctive relief in the form of "superintending federal injunctive decrees directing state officials" is an extraordinary remedy.  Morrow v. Harwell, 768 F.2d 619, 627 (5th Cir. 1985). Emphasizing its extraordinary character, the Fifth Circuit has cautioned that an injunction "should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements."  PCI Transportation Inc. v. Fort Worth & Western Railroad Co., 418 F.3d 535, 545 (5th Cir. 2005)(citations omitted).

Additionally, because this case concerns prison conditions, the Prison Litigation Reform Act (the "PLRA") imposes *additional restrictions* on the authority to grant an injunction.  The PLRA provides that "[p]rospective relief in any civil action with

42

respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1). In particular, the PLRA prohibits an order granting prospective relief or a preliminary injunction unless the court *first* finds that such relief is: (1) narrowly drawn; (2) extends no further than necessary to correct the harm; and (3) is the least intrusive means necessary to correct that harm. See 18 U.S.C. §§ 3626(a)(1)(A), 3626(a)(2). In considering a prisoner's request for prospective relief, the reviewing court "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system" caused by the relief and shall respect the certain principles of comity where state or local law is concerned. See 18 U.S.C. §§ 3626(a)(1)(B), 3626(a)(2).

In this case, Plaintiff fails to meet his burden to persuade the Court that injunctive relief is appropriate under the governing legal standard or the restrictions found in the PLRA. Plaintiff's failure to carry his burden is fatal to his claims. See PCI Transportation Inc., 418 F.3d at 545; see also Stallworth v. Greer, 227 Fed. App'x 415, 2007 WL 1454481 (5th Cir. 2007)(affirming the dismissal of a prisoner's complaint for global injunctive relief from retaliation by prison officials where the prisoner failed to carry his burden of persuasion).

Plaintiff has shown no constitutional violations, and he has

alleged no viable past wrong, much less a continuing harm or a real and immediate threat of repeated injury in the future. <u>See</u> <u>Society of Separationists, Inc. v. Herman</u>, 959 F.2d 1283 (5th Cir. 1992)(citing <u>Allen v. Wright</u>, *supra*.) The specific factual allegations presented to the Court in support of Plaintiff's claims are certainly frivolous, if not trivial. Plaintiff has presented numerous conclusory allegations, but no facts to support those allegations.

## CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Plaintiff's claims be **DISMISSED as frivolous** under 28 U.S.C. §1915(e)(2)(b).

**Under the provisions of 28 U.S.C. §636(b)(1)(c) and Fed.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the clerk of court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.**

**Failure to file written objections to the proposed factual finding and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the**

factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See Douglas v. United Services Automobile Association, 79 F.3d 1415 (5th Cir. 1996).

THUS DONE AND SIGNED in Chambers at Alexandria, Louisiana, this 12th day of February, 2009

_____
JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE